BURDEN, The JAMES A. See Cases Nos. 7,296 and 7,297.

BURDEN, The WILLIAM F. See Case No. 12,558.

## Case No. 2,145.
### BURDETT v. ESTEY et al.
[15 Blatchf. 349;[1] 4 Ban. & A. 7; 15 O. G. 877.]

Circuit Court, D. Vermont. Nov. 16, 1878.[2]

PATENTS—REED ORGANS—VALIDITY—INFRINGEMENT.

1. The 1st, 2d and 4th claims of the letters patent granted to Riley Burdett, February 23d, 1869, for 17 years from the 24th of August, 1868, for an "improvement in reed organs," namely: "(1) The arrangement, in a reed musical instrument, of the reed board A, having the diapason set a and its octave set b, and the additional set L, extending from about at tenor F upward through the scale, substantially as and to the effect set forth; (2) the reed board A, and foundation board G, constructed with the contracted valve openings D, F, F, and the reeds arranged in relation thereto, all in the manner described; (4) in connection with the reed board A, having the sets a, b and L, as described, the independent dampers B and M, as set forth," construed.

2. The invention covered by the first claim is not the mere addition to the reed board of an organ having two sets of reeds, of an intermediate partial set from tenor F upwards, but it is the addition to such a reed board of such an intermediate partial set, placed and constructed in the manner set forth in the specification and drawings annexed to the patent.

3. Said 1st and 2d claims are valid. Said 4th claim is invalid, for want of invention. Said

patent is not void because of any unreasonable neglect or delay to enter a disclaimer to either the 3d or the 4th claim.

[See note at end of case.]
[Cited in Hake v. Brown, 37 Fed. 785.]

4. The plaintiff *held* to be entitled to recover on the 1st and 2d claims, without costs, although he did not, before bringing the suit, disclaim what is covered by the 4th claim, provided he should file a proper disclaimer of what is claimed in the 4th claim.[3]

[Followed in Coburn v. Schroeder, 8 Fed. 519. Cited in Matthews v. Spangenberg, 19 Fed. 824.]

[In equity. Bill by Riley Burdett against Jacob Estey and others to restrain infringement of letters patents No. 87,241, granted to complainant February 25, 1869, for an improvement in reed organs, and for an accounting. Decree for complainant perpetually enjoining defendants, and order of reference to ascertain the profits and damages.]

George F. Edmunds and Edward J. Phelps, for plaintiff.

William M. Evarts, Edmund Burke, and Edward N. Dickerson, for defendants.

Before BLATCHFORD, Circuit Judge, and WHEELER, District Judge.

BLATCHFORD, Circuit Judge. On the 12th of October, 1867, Riley Burdett, of Chicago, Illinois, the plaintiff in this suit, filed in the patent office an application for a patent for an "improvement in reed organs." The proposed specification was sworn to by him on the 28th of June, 1867. As originally sworn to and filed, the specification was in these words: "To all whom it may concern: Be it known, that I, Riley Burdett, of Chicago, in the county of Cook and state of Illinois, have invented a new and useful improvement in reed organs, and I do hereby declare the following to be a full, clear and exact description of the same, reference being had to the accompanying drawings, in which Fig. 1 is a perspective view of one of my reed celeste organs; Fig. 2 is a diagram plan, showing the relative arrangement of the reeds; Fig. 3 is a vertical transverse section of my reed board, &c. This invention consists, first, in the arrangement of the reed board; second, in a method of tuning, by which a peculiar quality of tone is produced, and by which the power of the instrument is greatly increased, without an increased resistance in the action, and without an increase of power being necessary to operate the bellows. The advantages gained by my peculiar arrangement are a greatly increased power and variety of tone. This is effected by the use of an additional set of reeds, commencing at tenor F, or thereabouts, and running upward through the scale of the instrument, and tuning the same in the peculiar manner hereinafter described. No other reed mu-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Reversed by the supreme court in Estey v. Burdett, 109 U. S. 633, 3 Sup. Ct. 531.]

[3] [For engravings illustrating the invention for which the patent sued upon was granted, see the report of the case in the supreme court, 109 U. S. 633, 3 Sup. Ct. 531.]

sical instrument containing the same number of reeds, so far as I know, has ever possessed so great a variety or pleasing quality of tone, while simplicity of construction, compactness of form, and ease of operation are other excellences of this arrangement, not found in others. I will now describe particularly the construction of that part of my instrument which forms the subject of this patent. The case, bellows, pedal, &c., may be, in general construction and arrangement, like those in common use, and, therefore, no special description is required. The foundation of the reed board is also constructed in the usual manner, but the reed board proper, in itself, differs from the ordinary reed board in the following particulars, viz.: The main board A contains two sets of reeds running through the entire scale, the back set of which is marked a and is tuned as a unison or diapason, while the front or octave set, marked b, is tuned an octave above the diapason. In the arrangement of these reeds, it will be seen that the lowest and longest reeds in the diapason and the octave sets are placed with their vibrating ends as near together as they can be, with room only for the tracker pin which communicates the motion of the key to the valve beneath the reeds. But, as the reeds continually shorten as they advance upward in the scale, there is necessarily a vacant space left between the diapason set a and the octave set b, which constantly enlarges itself, and has heretofore been regarded as useless. Within this space, commencing on tenor F and running upward through the scale, I have introduced a third set of reeds, L, which forms the distinguishing feature of this instrument. These are placed in the reed board over the octave set b, and run obliquely to the foundation board G, as shown in Fig. 3, the vibrating ends resting on the same base as the other sets of reeds, a and b. These reeds are of the same size as the corresponding ones in the diapason a., and are tuned either a trifle above or below the diapason, but only sufficiently so to produce a slightly wavering and undulating quality or effect, without producing any discord. A few trials will enable any tuner of reed instruments to tune these reeds so as to realize the best effect. This method of tuning will, when this set of reeds, which I have named the 'Harmonic Celeste,' is drawn and used in connection with the diapason, produce a most wonderfully pleasing and captivating effect, while the power and beauty of both sets of reeds are greatly augmented and enriched, in a manner which cannot be realized without being heard. Fig. 2 shows a top view of the reed board proper, wherein the location of the reeds is shown with reference to the divergence of the reeds of the diapason set a and the octave set b, and also the space afforded for the introduction of the third set, L. Fig. 3 exhibits a transverse section of my reed and foundation boards, showing the arrangement of my reeds and the valve connections. In this figure, A is the reed board. G is the foundation board. D is the valve opening. E is the valve, and F F are the throats over which the reeds are located and placed. The valve E is retained in its proper place by the pins e, e and spring H, and is operated by the tracker pin I, which rests upon its upper surface and passes upward through the reed board to the under surface of the key N. The swell boards J and K and stop dampers B and M are raised, whenever desired, by the knee stop C, fig. 1, or by a hand-draw stop, or by some other convenient device. Another important advantage arising from the introduction of the harmonic celeste is, that a greater power and variety is attained, than can be by the use of any of the octave coupling arrangements now in use. These, while they augment the power, by drawing down octaves to the keys actually played, are objectionable, inasmuch as they offer more than double the resistance to the key and are thus often exceedingly undesirable. In my instrument, no such objection can ever arise, as the pressure upon the keys is always the same, whether one or all the sets of reeds are used. This is of prime importance to the performer, as the required exertion becomes involuntary and not a matter of calculation, and thus the mind is not distracted from the proper feeling and expression of the music performed. Having described my invention and its utility, what I claim as new and desire to secure by letters patent of the United States is: (1.) The arrangement, in a reed musical instrument, of the reed board A, having the diapason set a and its octave set b and the additional set L, extending from about at tenor F upwards through the scale, substantially as and to the effect set forth; (2.) The arrangement of the diapason set a and the harmonic celeste L, tuned as described, so as to produce the effect set forth; (3.) Tuning the additional set L, in relation to the diapason, in the manner set forth; (4.) The arrangement, in a reed musical instrument, of a set of reeds tuned after the manner of the set L, in relation to and in connection with one or more sets of reeds in the same reed board." On the 4th of November, 1867, the application was rejected by the patent office. The letter of rejection said: "The application above referred to has been examined, and the arrangement of the reed board claimed is fully anticipated in patent granted to Riley Burdett, January 9th, 1866; also, patent granted to G. G. Hunt, October 23d, 1855. In respect to the mode of tuning claimed, the 'voix celeste' of the French, and 'unda maris' of the German, the former in the great organ of St. Vincent de Paul, Paris, and the latter in the church of St. Vincent at Breslau, are the same as the manner claimed. 28 Philosophical Mag. p. 150. The application is rejected." On the 26th of November, 1867, the plaintiff

amended his 2d and 3d proposed claims, so as to read as follows: "(2.) The arrangement of the diapason, its octave set and the harmonic celeste L, tuned as described, substantially as described, so as to produce the effect set forth; (3.) In a reed musical instrument such as described, tuning the additional set L in relation to the diapason, in the manner set forth." At the same time he added 3 new proposed claims, as follows: "(5.) The reed board A, and foundation board G, constructed with the contracted valve openings D, F, F, and the reeds arranged in relation thereto, all in the manner described; (6.) The diapason a, and its octave, or principal, b, arranged over the same valve opening, as described, so that the octave unison may be produced, when desired, without the use of coupler, and without any additional pressure upon the keys; (7.) In connection with the reed board, A, having the sets a, b and L, as described, the independent dampers B and M, as set forth." On the 11th of December, 1867, the application was again rejected by the patent office. The letter of rejection said: "The application above referred to has been re-examined as amended. The office can see nothing patentable in the first clause of claim. The practice of arranging the reed board in one, two or more sets of reeds, or parts of sets, is contemplated in the references given, and also in the case of Riley Burdett's sub-bass attachment, patent granted September 10th, 1861. It cannot be patentable to apply additional reeds to the upper part of the scale, when it is in practice to apply them to the lower part of it; and, in church organs, the stops, both reed and flute, seldom extend entirely through the manual. In the second clause of claim, the tuning of the extra reeds is claimed as a new feature in the arrangement claimed in the first clause. The arrangement is the same, whether the reeds are tuned or not, and the manner in which they are tuned cannot affect the arrangement. The method of tuning claimed in the third clause is fully answered in the references given. The fact of this being a reed instrument, and the references pipe organs, cannot affect the mode of tuning, although this mode is applied to reed instruments. See an accordeon made by Busson, 166, Boulevard, Paris, at John F. Ellis' music store in this city. The fourth clause of claim is the same as the second, and the remarks upon that clause are equally applicable to this. The three additional claims filed in the amendment of November 26th, 1867, are fully anticipated in patent above referred to, granted to Riley Burdett, January 9th, 1866, and assigned to Jacob Estey & Co., except the last claim, which features are not shown in the drawings, but are used in practice. The application is the second time rejected." The plaintiff took an appeal to the examiners in chief, and they, on the 29th of August, 1868, rendered the following decision:

"The decision of the examiner, rejecting the second, third and fourth claims, is affirmed, and his decision rejecting the first and the amended claims, numbered five, six and seven, is reversed. It is considered that the references do not show the arrangement described in the last mentioned claims, and that a patent should properly be allowed therefor." Thereupon, letters patent were granted to the plaintiff, on the 23d of February, 1869, for 17 years from the 24th of August, 1868, on the foregoing specification, with the claims above numbered 1, 5, 6, 7, claims 5, 6 and 7 being severally numbered 2, 3 and 4.

The entire contest in this case is as to the novelty and validity of the 1st, 2d and 4th claims of the plaintiff's patent. The plaintiff has offered no proof that the defendants have infringed the third claim. The especial contest is as to the first claim. It is apparent, from the specification in connection with the four claims originally made, that the plaintiff originally intended to claim two things: 1st, his alleged new arrangement of the reed board; 2d, his alleged new method of tuning his additional partial set of reeds a trifle above or below the back diapason set. a. The arrangement of the reed board, and of the sets of reeds in it, was intended to be claimed, and was claimed, in the first claim, without reference to any method of tuning the additional partial set. The original second claim claimed the arrangement of the three sets of reeds in the first claim, with the third set tuned in the manner described. It is quite clear, that the plaintiff did not intend to claim the same thing, by his original first claim, that he claimed by his original second claim; that he did not regard the alleged new method of tuning the additional partial set as forming any part of the first claim; and that the patent office did not intend to grant to him, and did not grant to him, in granting the first claim, a claim in which such method of tuning formed any element. The words, "to the effect set forth," in the first claim, have no reference to the effect produced by such method of tuning. The effect referred to in the claim could extend only to an effect produced by the arrangement specified in the claim; and such arrangement does not produce the effect referred to in the specification as that produced by drawing and using the harmonic celeste in connection with the diapason, when the harmonic celeste is tuned as described. The words, "to the effect set forth," mean no more than the words, "as set forth." They do not have the same meaning as the words, in the original second claim, "so as to produce the effect set forth," the effect thus referred to being the effect produced by having the arrangement of the reed board with the three sets of reeds as described, and tuning the third set in the method described, and then using the diapason set and the third set together.

In order to determine the questions involved as to the novelty and validity of the first claim, it is necessary to first ascertain what is the proper construction of that claim. It is not only, as has been shown, a claim into which no method of tuning the additional set of reeds enters as an element, but it is a claim to the arrangement of a reed board having in it the sets of reeds. It is a claim to the arrangement of the reed board A, having in it the two sets of reeds and the additional set, "substantially as and to the effect set forth" in the body of the specification. The arrangement claimed is not merely one in which there are the two sets of reeds and the additional set, but it is one in which such three sets of reeds are arranged, with reference to the reed board and to each other, substantially as and to the effect set forth in the specification. The arrangement is described thus: The main reed board contains two sets of reeds running through the entire scale, a diapason set and an octave set, the latter tuned an octave above the diapason. The lowest and longest reeds in those two sets are placed with their vibrating ends as near together as they can be, with room only for the tracker pin between them. But, as the reeds continually shorten as they advance upward in the scale, it results, that there is an unused part of the reed board between the diapason set and the octave set, which unused part is constantly growing wider. This hitherto unused part of the reed board the patentee calls "a vacant space." It is not a vacant space in the sense of being a space of air occupied by no material substance. It is a space occupied by a part of the reed board, but not occupied by reeds or by any other operative part of the mechanism. It is vacant in that sense. The patentee proposes to occupy that vacant space and make it of use, by putting an additional partial set of reeds into it, and thus getting, with a reed board no larger than one required for two full sets of reeds, the substantial advantages of three sets of reeds, which had not before been attained with so small a reed board. Therefore, within, and into the body of, this unused part of the reed board, commencing on tenor F and running upward through the scale, he introduces a third set of reeds, which he places in the reed board, in its body, in the same reed board in which the other two sets are placed, in the hitherto unused part of such reed board. He places them over the octave set, and they run obliquely to the foundation board, and their vibrating ends rest on the same base as the other two sets of reeds. The specification does not state why the vibrating ends of the reeds in the third set are to be brought down to the same base with the vibrating ends of the reeds in the other two sets. But that was not necessary. The statement of the fact that it is to be done is sufficient. It cannot be done unless the reeds of the third set enter and pass down through the reed board

and thus occupy the hitherto unused part of the reed board. It cannot be done if they are wholly above the reed board, nor can it be done if they do not run obliquely downward into the body of the reed board. This, therefore, is the arrangement referred to in the first claim, as the arrangement set forth in the specification. The point of advantage, in bringing down the vibrating ends of the reeds in the third set so that they shall rest on the same base with the vibrating ends of the reeds in the other two sets, is shown, by the evidence, to be the same point of advantage which is set forth in the specification of the patent granted to the plaintiff January 9th, 1866. In that, the invention is stated to be to so make the reed board that the three or the four sets of reeds in it shall be acted upon instantly and simultaneously by the rush of air upon the opening of the valve; and it is set forth that that result is effected by placing two sets of reeds on the same horizontal plane, and placing the other sets on an inclined plane, each with its base on the same level as the first and second sets, thus making the head of each reed equidistant from the valve and making each produce instantaneous concerted sound. Although this feature thus existed before in reed boards having three or more full sets of reeds, it did not exist before in a reed board arranged like that in the plaintiff's patent of 1869, having three sets of reeds in a reed board no larger than that theretofore used for two full sets; and, although an additional partial set of reeds may have before been added to the two sets, commencing at tenor F and running upward through the scale, such additional partial set did not have the vibrating ends of its reeds resting on the same base with the vibrating ends of the reeds in the other two sets. One feature of the arrangement claimed in the first claim may have before existed in one structure, and the other feature may have before existed in another structure, but they did not before co-exist in any one structure; and it involved invention for the plaintiff to combine and arrange them in his reed board.

The plaintiff was called as a witness on behalf of the defendants, and, on his direct-examination, was asked; "Q. 37. State, if you please, what devices or improvements in the reed organ you supposed you invented, and what you believe to be described and claimed in your letters patent marked Exhibit A?" He answered: "A. In the old tri-reeds, or organs with three full sets of reeds, there were many objections, and, in consequence of those objections, it never became a desirable or popular instrument with organ buyers. Those objections were, some of them, too long a valve required too much power, to secure the valve sufficiently to hinder the escape of wind through the valve seat or opening, and, consequently, to overcome this, extra power on the long valve by a touch of the key with the finger; also a

socket board made with the long valve was more liable to spring, so that the valve seat would become crooked, and render it useless, on account of leaking air, in consequence; besides, the instrument required to be a little larger, on account of a larger bellows being necessary to supply sufficient air for the reeds; besides, the tone not being a good or desirable one in the tri-reed board. To overcome these objections, and, perhaps, others I might mention, I conceived the idea of devising an instrument in a more desirable and practical form, in which I could embody everything desirable in the old tri-reed, and introduce features that were popular and desirable. I, therefore, conceived the idea of taking the double reed board and introducing a set of reeds in a space unoccupied between the two reeds of that board on the treble end, and introduce a third set of reeds, without altering the two reed or double board, and thereby secure just as practical and desirable an action as the ordinary double reed board, and be enabled to produce the best effects of a third set of reeds, as far down in the scale as desirable to accomplish this result; and this, in the main, is what I claim as my improvement, as set forth in letters patent Exhibit A." One of the desirable features in the tri-reed board, as set forth in the plaintiff's patent of 1866, and a feature which assisted in giving the best effect to a third set of reeds, was the feature of bringing down the vibrating ends of the reeds in the third set to the same base with the other two sets. This feature is fully set forth in the patent of 1869, as a feature of the arrangement of the three sets in the reed board. The defendants' expert, Mr. Peale, was asked, on his direct-examination by the defendants, the following question: "Q. 11. In the specification annexed to complainant's patent Exhibit A, the following language is used: 'These,' (referring to the intermediate partial set of reeds, L,) 'are placed in the reed board over the octave set b, and run obliquely to the foundation board G, as shown in Fig. 3, the vibrating ends resting on the same base as the other sets of reeds, a and b.' If a reed organ constructed with a reed board containing a diapason set, an octave set, and an intermediate partial set of reeds arranged in the same manner as the patent requires, except that the vibrating ends of the intermediate partial set of reeds do not rest upon the same base with the diapason and octave sets, but with the vibrating ends of its reeds varying from three-sixteenths of an inch to five-sixteenths of an inch above the vibrating ends of the diapason and octave sets of reeds, would or would not a reed board so constructed and arranged come within the description of said specification, above quoted?" He answered: "A. It would not."

The invention covered by the first claim is, therefore, not the mere addition to the reed board of an organ having two sets of reeds, of an intermediate partial set from tenor F upwards, but it is the addition to such a reed board of such an intermediate partial set, placed and combined in the manner set forth in the specification and drawings annexed to the patent. What that manner is has been hereinbefore defined. The record contains an admission on the part of the defendants, that an organ put in evidence and marked complainant's Exhibit C, was made and sold by the defendants at Brattleboro', in Vermont, prior to the commencement of this suit. Mr. Renwick, the plaintiff's expert, testifies, that said Exhibit C contains, in his opinion, the arrangement of instrumentalities recited in the first claim of the plaintiff's patent, because it has a reed board corresponding with the reed board A described in the patent, having a complete diapason set of reeds at one side of said reed board, and a complete octave set of reeds at the other side of said reed board, and having an additional partial set of reeds extending from about tenor F upward through the scale of the instrument, arranged intermediately between and above the other two sets of reeds, substantially as represented in the drawings of the patent, so that the width of reed board required is practically the same as that required for the two complete sets of reeds only; and that the reeds of said Exhibit C correspond substantially, in their relative dimensions, and positions, and arrangement in the reed board, with the reeds described and represented in the plaintiff's patent, and are, therefore, substantially the same, considered as mechanical instrumentalities. This testimony is not contradicted, and it must, therefore, be held that the charge of infringement of the first claim is established.

The main question in the case is, whether the invention covered by the first claim was new. The evidence is very voluminous. It would not be profitable to discuss it at length. Most of it relates to the question whether one Arvid Dayton was the prior inventor of what is covered by the first claim. All the evidence, and the exhibits, on the question of novelty, have been carefully considered and examined, and the conclusion of the court is, that no arrangement of reed board and sets of reeds substantially the same as that covered by the said first claim, as that claim has been hereinbefore defined, existed prior to the plaintiff's invention of what is covered by said first claim. Much of the evidence in the case relates to Exhibit 21, produced by the defendants as an organ made by Dayton in 1866, prior to the plaintiff's invention; and a large part of it consists of evidence put in by the plaintiff with a view of establishing as a fact, that the parts of that organ which are contended by the defendants to be substantially, in arrangement, like the arrangement specified in the first claim, were fabricated for the purposes of this suit, after it was commenced, while another large part of it consists of evidence put in by the de-

fendants with the view of establishing as a fact, that those parts were made in 1866, prior to the plaintiff's invention. The plaintiff's view as to such fabrication would, if true, make it necessary to conclude that such evidence on the part of the defendants is, to a large extent, founded on fraud and perjury. An examination of the evidence on both sides on that subject has led the court to the conclusion, that Exhibit 21 contained, when it was made in 1866, the same arrangement of reed board and reeds which it now contains. But such arrangement did not and does not embrace the entire arrangement specified and claimed in the plaintiff's first claim, as that arrangement has been hereinbefore defined. Although there was and is in Exhibit 21 an additional partial set of reeds put in on an incline, and although the reeds in that set may have been tuned flat in relation to the reeds in the diapason set, yet such additional partial set was not and is not in the vacant space between the other two sets, in the sense of the plaintiff's patent, and was not and is not at all in the reed board as made for two sets of reeds, but is entirely above such reed board, and is placed in an addition to such reed board, constructed expressly for receiving such additional partial set, and, although the reeds in such additional partial set run obliquely, they do not run to the foundation board, but run only to such reed board, and the vibrating ends of such reeds do not rest on the same base as the other sets of reeds, but extend down no farther than the upper surface of such reed board, and are the entire thickness of such reed board above the vibrating ends of the reeds in the other two sets. No arrangement of reed board and reeds, adduced as anticipating the invention covered by the first claim of the plaintiff's patent, contains the entire arrangement claimed in that claim.

The second claim is in these words: "The reed board A and the foundation board G, constructed with the contracted valve openings D, F, F, and the reeds aranged in relation thereto, all in the manner described." The expression, "the reeds." in this claim, means, the reeds in the two sets and the additional set. In the specification and drawings, D is the valve opening in the foundation board, and F, F, F, are the throats or air passages communicating with the reeds. The language of the second claim, in connection with that of the descriptive portion of the specification, and with the drawing, Fig. 3, indicates, as testified by the plaintiff's expert, Mr. Renwick, "that the idea conveyed by the word 'contracted,' when used in reference to the valve openings and passages indicated by the letters D and F, is, that the valve openings and passages for the two complete sets of reeds and the intermediate partial set are contracted or condensed within the same space which is usually occupied by the valve openings and passages for two complete sets of reeds only, in an instrument of the usual construction previous to the date of the invention." As otherwise expressed by the same witness, the valve opening in the foundation board and its valve "are not practically of any larger size than is required for the first two sets of reeds only, so that the operator has the advantage of using three sets of reeds throughout a large portion of the scale of the instrument, without applying any more force to the keys than is required for opening the valves for two complete sets only." The valve openings in the plaintiff's arrangement are contracted from what their length and size would be in an instrument with three full sets of reeds, as in the tri-reed board shown in the plaintiff's patent of 1866. The difficulties arising from the use of the long valve of the tri-reed board with three full sets of reeds, are pointed out in the testimony of the plaintiff, in his answer, before cited, to question 37, on his direct-examination. The plaintiff, by his new arrangement, gets the advantages of three sets of reeds, so far as three sets are practically useful, and dispenses with the difficulties. attending the large valve openings before used with three full sets of reeds, and has valve openings no larger than would be used in a reed board with only two full sets of reeds. In this sense, his valve openings are "contracted," when they are considered with reference to the reeds used with them; and the invention claimed in the second claim is useful and patentable. It has been infringed by the defendants, in the making and selling of Exhibit C. The invention covered by it was new at the date of the plaintiff's invention. Nothing is adduced that anticipates it. It is not found in the plaintiff's patent of 1866. The valve openings in Exhibit 21 are not the contracted valve openings of the plaintiff, but are as large as the valve openings in a tri-reed board having three full sets of reeds. The lowest and longest reeds in the two full sets do not. as in the plaintiff's arrangement, have their vibrating ends as near together as they can be, with room only between them for the tracker pin. Nor are the plaintiff's contracted valve openings found in any of the other prior reed boards of Dayton.

In regard to the fourth claim, the evidence shows, that independent dampers, such as those mentioned in that claim, were used in reed organs many years before the plaintiff's invention. There was no invention in adapting such dampers to a reed board having the sets of reeds described in the plaintiff's patent of 1869.

It is contended, on the part of the defendants, that the plaintiff's patent is void, on the ground of deceptive and fraudulent description in the specification; and on the ground of fraudulent and deceptive misdescription in regard to the method of tuning,

and in regard to the peculiar quality of the tone produced, and in regard to the power of the instrument and its ease of operation, and in regard to other matters; and because it claims what is not described in the specification· or shown in the drawings. These objections have been considered by the court, and are not regarded as tenable.

. It is also contended, that the plaintiff's patent is void, because he has not disclaimed the inventions claimed in the third and fourth claims of his patent. Assuming that, in a suit where the third claim was alleged to be infringed. and was involved, the court would, on the construction proper to be given to such claim, hold that it was invalid, it cannot be held, in this case, that the plaintiff has unreasonably neglected or delayed to enter, at the patent office, a disclaimer to either of those two claims. The questions involved in construing those two claims, with reference to their validity on the points of novelty and patentability, are largely questions of law, and not of fact; and the fact that the patent was granted for those two claims, under the circumstances attending the granting of it, entitled the plaintiff to repose upon it as valid in respect to those two claims, until the decision of a court holding otherwise. This is the view deducible from the authorities. O'Reilly v. Morse, 15 How. [56 U. S.] 62; 121; Seymour v. McCormick, 19 How. [60 U. S.] 96, 106. The plaintiff is entitled to recover on the first two claims of his patent, although he did not, before the commencement of this suit, disclaim what is covered by his fourth claim, inasmuch as he was not guilty of unreasonable neglect or delay, in not making such disclaimer; but he cannot recover the costs of this suit, because he did not, before the suit was brought, file in the patent office a disclaimer of what is claimed by his fourth claim. O'Reilly v. Morse, and Seymour v. McCormick, above cited; Tuck v. Bramhill [Case No. 14,213]; Hall v. Wiles [Id. 5,954]; Smith v. Nichols, 21 Wall. [88 U. S.] 117, and cases there cited.

When the plaintiff shall have presented to the court satisfactory evidence that he has filed a proper disclaimer of what is claimed by his fourth claim, he will be entitled to a decree for a perpetual injunction, and an account of profits and damages, as respects the first and second claims of the patent, but without costs.

NOTE [from original report]. This case, because of the large interests involved in it, and for reasons growing out of the character of some of the evidence in it, was heard before the circuit judge and the district judge sitting together. It was argued on both sides with great care, research, ability and zeal. and we have given to it our most earnest and attentive consideration. The results reached express the concurring views of both of the judges.
[NOTE. For denial of motion to punish de-fendants for violation of the injunction granted herein, see Case No. 2,146, and, for the final decree in favor of complainant, see Burdett v. Estey, 3 Fed. 566.

[The defendants appealed from the final decree to the supreme court, which reversed the decree below, and remanded the cause with directions to dismiss the bill. The reasons assigned for reversal were that the alleged infringing organs contained nothing which, so far as claim 1 was concerned, was not found in the organ invented by one Dayton, prior to the invention of complainant, and as to claim 2, i. e. "the reed board A and the foundation board G constructed with the contracted valve openings D, F, F. and the reeds arranged in relation thereto, all in the manner described," that, in view of the state of the art, there was no invention in making the length and size of the valve opening greater or less in a reed board of a given width or where the reed board was made wider or narrower, or had more or less sets of reeds in it, either full or partial, and that the vibrating ends of the lowest and longest reeds in such Dayton organ were as near together as they were in the reed boards of the alleged infringing organs. Estey v. Burdett, 109 U. S. 633, 3 Sup. Ct. 531.]